## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS S. BURKE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-1549 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| NATIONSTAR | ) | |
| MORTGAGE, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Thomas and Courtney Burke wired $137,341.18 to their lender as part of a refinancing of their home mortgage loan. Or so they thought. The Burkes received the wiring instructions by email, and they believed that the instructions had come from their lender, Nationstar Mortgage. In reality, the wiring instructions came from a fraudster who directed the Burkes to send their money to his bank account.

Someway somehow, the fraudster had compromised the email communications between the Burkes and Nationstar. The fraudster sent emails to the Burkes, posing as Nationstar. And the fraudster sent emails to Nationstar, posing as the Burkes. When the Burkes received the wiring instructions, they believed that they were following the lender's directions, and were on the cusp of improving their financial situation. Instead, they were wiring their hard-earned money to someone who planned to take advantage of them.

A few days later, the Burkes received an alarming call from the receiving bank. The bank noticed that the account was burning through the cash at an unusual rate, with lots of spending in a short period of time. The bank then locked down the account, and the Burkes got

on the phone with Nationstar.  They quickly figured out that the communications were phony.

They lost over $35,000.

A few months later, the Burkes sent two letters to Nationstar, asking for information

about how the theft could have happened.  In response, Nationstar didn't have much to say,

except that Nationstar had done nothing wrong.

So the Burkes sued.  They brought a collection of claims under state law, including

negligence, breach of fiduciary duty, negligent misrepresentation, and so on.  They also brought

a claim under a federal statute, the Real Estate Settlement Procedures Act, which requires loan

servicers (like Nationstar) to provide information in certain circumstances.  They sued Nationstar

and its affiliate company, Title365.

Defendants moved to dismiss.  For the reasons stated below, the motion to dismiss is

granted in part and denied in part.

### Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations

of the complaint.  *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020).  The Court

"offer[s] no opinion on the ultimate merits because further development of the record may cast

the facts in a light different from the complaint."  *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir.

2020).

Plaintiffs Thomas and Courtney Burke wanted to refinance their home mortgage loan.

*See* Am. Cplt., at ¶ 2 (Dckt. No. 15).  As part of the refinancing, they wanted to pay a substantial

portion of the principal of their existing loan before getting a new loan.  *Id.*  The couple reached

out to their lender, Defendant Nationstar Mortgage (d/b/a "Mr. Cooper"), and got the ball the

rolling.  *Id.*

Nationstar was the lender and servicer of the existing loan, and it would be the lender and servicer for the new loan, too. *Id.* at ¶¶ 2, 42. As the name suggests, a servicer is an entity that services a loan, by collecting payments, providing customer service, and otherwise handling dealings with the borrower.

The Burkes had a balance of $376,000 on their loan, and the couple agreed to pay Nationstar $137,341.18 by wire transfer. *Id.* at ¶¶ 18, 30. Nationstar set the refinance for closing in March or April 2020. *Id.* at ¶ 3.

Nationstar designated its affiliate title company, Defendant Title365, as the closing agent. *Id.* A closing agent basically handles the documentation during the closing process for a mortgage loan. Despite its title as the closing agent, Title365 never communicated with the Burkes. *Id.* at ¶ 47. Instead, Nationstar took the lead and shepherded the Burkes through the refinancing process.

Specifically, Michael Sanford – a Nationstar loan officer – handled the communications with the Burkes. *Id.* at ¶ 19. Some of the communications took place over the phone. *Id.* at ¶ 18. But many of the communications took place by email. *Id.*

In particular, Nationstar sent the closing documents and the wiring instructions by email. *Id.* at ¶¶ 4, 18–19. Nationstar used regular, unsecured email. *Id.* at ¶¶ 4, 46, 56. Thomas Burke communicated with Nationstar using a Gmail address. *Id.* at ¶ 40(c).

According to the complaint, Nationstar knew the risks associated with sending funding and wiring instructions through email. *Id.* at ¶ 23. The "high risks of using emails to transmit bank wire transfer instructions" are well known in the industry. *Id.* at ¶ 87; *see also id.* at ¶¶ 4, 85(b) of Count II, 85(h) of Count II, 121. In fact, Nationstar's own policy prohibited the use of

email for loan closing documents. *Id.* at ¶¶ 40(a), 48–49. But Nationstar used email communications for its own "pecuniary interests." *Id.* at ¶ 23.

Unlike Nationstar, the Burkes did not know the risks of communicating wire instructions by email. They are "unsophisticated consumers," and they "did not know how unusual it was for the lender to provide funding instructions, and did not know how risky it is to transmit wire instructions through email." *Id.* at ¶ 22.

On March 20, 2020, Nationstar emailed the closing documents to Thomas Burke. *Id.* at ¶ 19. Nationstar explained that Burke needed to "use the email" to sign the documents electronically. *Id.* Thomas Burke signed them that day (presumably electronically). *Id.* at ¶ 20.

Nationstar then sent another email, saying that the company would send wiring instructions. *Id.* at ¶ 21. Sanford didn't reveal how, exactly, he would send the wiring instructions. He wrote: "Thanks, once I have the final dollar amount for closing I'll let you know and send the instructions for wiring it." *Id.* But the Burkes "expected" Nationstar to send the wiring instructions by email. *Id.*

At some point, it appears that Nationstar did, in fact, email legitimate wiring instructions to the Burkes. According to the complaint, Defendants "emailed the Burkes' wire instructions." *Id.* at ¶ 23. But the complaint does not reveal when, exactly, Nationstar emailed the legitimate wiring instructions to the Burkes.

And more importantly, the complaint does not reveal whether the Burkes ever *received* the legitimate wiring instructions from Nationstar. Maybe Nationstar did email legitimate wiring instruction to the Burkes, but the email was intercepted and redirected somehow to the fraudster. The existence of legitimate wiring instructions seems to be an important part of the story, but in the complaint, that chapter is largely untold.

4

The Burkes expected the closing to take place within a few days. *Id.* at ¶ 24. On March 22, the Burkes and Nationstar agreed through email on a closing date of March 27. *Id.*

As it turns out, those communications were not secure. A fraudster intercepted the email exchanges between Nationstar and the Burkes. *Id.* at ¶ 25. The complaint doesn't reveal when the fraudster became involved, or how the fraudster entered the picture. The Burkes believe that the fraudster intercepted the communications through Nationstar's email system. *Id.*

The fraudster began sending emails to the Burkes and Nationstar, pretending to be the other party. *Id.* at ¶¶ 26–27. So the fraudster sent emails to the Burkes, pretending to be Nationstar. *Id.* at ¶ 26 ("It appears as though the fraudster used an email address of michaelsanford@tuta.com, but masked such email address so that it looked like the email came from Mr. Sanford's Mr. Cooper address."). And on the flipside, the fraudster sent emails to Nationstar, pretending to be Thomas Burke. *Id.* at ¶ 27 ("Upon information and belief, at the same time, the fraudster sent messages to Mr. Cooper using an email address such as 'tsburke@tuta.com.'").

At that point, the fraudster "took control of the transaction." *Id.* at ¶ 28. Nationstar communicated with the fraudster, thinking that it was Thomas Burke. And Thomas Burke communicated with the fraudster, thinking that it was Nationstar.

On March 25, two days before the closing date, the fraudster – disguised as Nationstar – emailed wiring instructions to the Burkes. *Id.* at ¶ 30. The email told the Burkes to wire $137,341.18 from their account at Chase Bank to an account at First Columbia Bank of Pennsylvania. *Id.* Unbeknownst to the Burkes, that account belonged to the fraudster. *Id.*

The couple wired the money on March 25, believing that they were following Nationstar's instructions. *Id.* Fortunately, that wire didn't go through.

First Columbia Bank refused to accept the wire and cancelled the transaction. *Id.* The complaint alleges that the bank detected suspicious conduct, but did not tell the Burkes. *Id.*

Meanwhile, the Burkes believed that they were on the cusp of refinancing their mortgage. They were blissfully unaware that a fraudster was out there, scheming to steal their money. They stayed at their home on the day of closing, waiting for the closing agent to show up. *Id.* at ¶ 32. But no one came. *Id.*

Nationstar provided no explanation for the non-appearance. The complaint alleges that Nationstar knew that the wire didn't go through – meaning the *real* wire, to the right account – so it cancelled the deal. *Id.* But Nationstar did not tell the Burkes that the company did not receive the funds. *Id.* The complaint alleges failure to receive the funds should have been a red flag. *Id.*

Nationstar never informed the Burkes that the initial transaction was cancelled because of fraud, either. *Id.* at ¶¶ 31, 33. As an aside, it is unclear what, exactly, Nationstar knew about the cancellation of the fraudulent wire. After all, the fraudster had emailed Thomas Burke about sending the funds to an account belonging to the *fraudster*, not an account belonging to Nationstar. *Id.* at ¶ 30 (alleging that the fraudster told the Burkes to wire the funds to the "fraudster's account"). Nationstar did not receive a copy of the communications between the fraudster and the Burkes. And presumably Nationstar was not affiliated with the fraudster's bank account. So it is not clear how Nationstar would have received notice that the wire didn't go through, when the money wasn't going to Nationstar's account.

But presumably Nationstar *did* expect to receive funds in a legitimate account. And one would think that Nationstar communicated the legitimate wiring instructions to the Burkes at some point. *Id.* at ¶ 23 (alleging that "Defendants . . . emailed the Burkes' wire instructions,"

without any details).  Presumably, Nationstar emailed legitimate wiring instructions to the Burkes at some point, and then noticed that the money did not arrive.

That money did not arrive because the Burkes never sent it there.  That is, the Burkes never sent the money to the *legitimate* account associated with Nationstar.  Instead, they sent it to the fraudster's account at First Columbia Bank of Pennsylvania.

Nationstar undoubtedly knew that it didn't receive the money.  But Nationstar never reached out to the Burkes and asked why the money didn't show up.  Instead, Nationstar "simply set another closing to happen a few days later."  *Id.* at ¶ 33.

The complaint does not reveal how, exactly, Nationstar communicated that new, legitimate closing date to the Burkes.  Maybe Nationstar gave them a call.  Or maybe Nationstar sent a legitimate email, from a real Nationstar email account.

In any event, the fraudster continued to lurk in the background, and sprung back into action.  On March 27, the fraudster emailed the Burkes – pretending to be Nationstar – with new wiring instructions.  *Id.* at ¶ 34.  The fraudster instructed the Burkes to wire the funds to a different account, at Wells Fargo Bank.  *Id.*

The Burkes followed those instructions, not knowing that they were sending the money to the fraudster's bank account.  The Burkes wired $137,341.18 to the fraudster's account at Wells Fargo Bank.  *Id.*; *see also id.* at ¶ 6.

Things went from bad to worse.  Three days later, Courtney Burke received a startling call from Wells Fargo Bank.  *Id.* at ¶ 35.  The bank reported that the funds "were being spent more rapidly than normal," raising suspicions of fraud.  *Id.*

Courtney Burke directed Wells Fargo to stop payment on the transaction.  *Id.* at ¶ 36.  At the same time, Thomas Burke hurried to his local branch of Chase Bank, letting the bank know

about the fraud and directing Chase Bank to "stop payment on the wire from the Chase end of the transaction." *Id.* at ¶ 37. (The Court assumes, but does not know for sure, that Chase had already sent all of the money to Wells Fargo. But maybe there were installments.)

Thomas Burke then got on the phone with Michael Sanford at Nationstar, sharing the alarming news that Wells Fargo had flagged the wire transfer as fraudulent. *Id.* at ¶ 38. They started comparing notes, and began to scrutinize the email exchanges. They took a close look at the email addresses that they had used about the wiring instructions. *Id.* at ¶ 39.

Before long, they figured out what had happened. They realized that they were receiving emails from fraudulent email addresses, and sending emails to fraudulent email addresses. *Id.* They discovered that the transaction had been hijacked, prompting a well-timed use of profanity. *Id.*

Fortunately, the Burkes were able to salvage most of the funds. *Id.* at ¶ 36. On April 6, the Burkes received $101,809.75 of their funds. *Id.* But the rest – totaling $35,531.43 – was stolen. *Id.* (alleging that the Burkes received $100,000); *id.* at ¶ 57 (alleging that the Burkes salvaged $101.809.75).

The Burkes lost tens of thousands of dollars. They wanted their money back. And they wanted answers, too.

Four months later, on August 13, 2020, the Burkes sent a letter to Nationstar, asking for information to get to the bottom of what had happened. *Id.* at ¶ 58. The Burkes labeled their letter a "Qualified Written Request Under Section 6 of the Real Estate Settlement Procedures Act." *See* 8/13/20 Burke Letter, at 1 (Dckt. No. 15-1). That's a federal statute, also known as "RESPA."

The letter posed 16 questions.  *Id.*  The first question asked for a "full explanation of the events leading to the loss by the Burke's [sic] of funds that were to be used to pay off their prior Mr. Cooper loan."  *Id.*  The next question asked "how a fraudulent party hacked into Mr. Cooper or Title 365."  *Id.*  More than a dozen questions followed.

And more broadly, the letter asked about Nationstar's "internal controls" to prevent fraud, and asked about other policies, too.  *Id.* at 2.  The letter also requested copies of the underlying documents, such as communications with the Burkes (or the fraudster), communications with between Nationstar and Title 365, any notes of phone calls about the Burkes, and so on.  *Id.*

Later that day, Nationstar sent a response letter and acknowledged receipt.  *See* 8/13/20 Nationstar Receipt (Dckt. No. 15-2).  "We take all matters seriously and are in the process of reviewing your concerns."  *Id.*  Nationstar promised an "investigation," and promised a response before the end of the month.  *Id.*

On August 27, 2020, Nationstar responded in more detail.  *See* 8/27/20 Nationstar Letter (Dckt. No. 15-3).  "[A]fter an investigation we're sharing with you what we found."  *Id.*

Nationstar didn't exactly share what it found.  It shared the revelation that Nationstar didn't think that Nationstar had done anything wrong.  And it shared the fact that Nationstar didn't have an obligation to give the Burkes any additional information.

In the opening paragraph, Nationstar told the Burkes that the refinancing didn't take place, and that funds were "missing."  *Id.*  "Mr. Thomas Burke was involved in a refinance review and closing that was not consummated.  Mr. Cooper [*i.e.*, Nationstar] investigated allegations relating to third party fraud and was able to assist the borrower in recovering some of the missing funds.  We were not directly involved in any wrongdoing."  *Id.*

9

It wasn't exactly a news bulletin to the Burkes that the refinancing didn't take place, and that their money was "missing." *Id.* And one can imagine that they were not comforted by Nationstar's declaration that Nationstar had done nothing wrong.

At that point, Nationstar told the Burkes that it wasn't going to tell them anything else. "[S]ome information you have requested does not pertain directly to the serving of the loan, does not identify any specific servicing errors, is overbroad, and/or is considered proprietary and confidential." *Id.* So Nationstar had no obligation to respond. "[T]his information is considered outside the scope of information that must be provided." *Id.*

Nationstar closed by expressing "regret" for the "inconvenience" that the Burkes had experienced when the "email account was compromised." *Id.* By "inconvenience," Nationstar apparently meant the theft of $35,531.43.

The second page contained a box entitled "RESPA RESPONSE TO NOTICE OF ERROR." It appeared to encapsulate Nationstar's official response to information under RESPA. "Under applicable federal law, we are required to inform you that after completing a reasonable investigation into the issues described above, it has been determined that no error occurred." *Id.* at 2.

The Burkes, for their part, thought that an "error" *had* occurred, because $35,531.43 was missing from their bank account. *See* Am. Cplt., at ¶ 81 (Dckt. No. 15).

That response did not satisfy the Burkes, so they sent a second letter and posed the same questions. *Id.* at ¶ 78; *see also id.* at ¶ 8. The timing of that letter is up in the air.[1] The Burkes

---

[1] The complaint attached the first letter (meaning the first QWR) dated August 13, 2020. *See* 8/13/20 Burke Letter, at 1 (Dckt. No. 15-1). The complaint refers to a "second" letter dated April 23, 2020. "The second qualified written request is in the form of a demand for Mr. Cooper to remedy the errors that occurred by paying Plaintiffs money, sent on April 23, 2020. Mr. Cooper did not respond in writing to the second qualified written request." *See* Am. Cplt., at ¶ 78 (Dckt. No. 15). That sentence suggests that the Burkes sent the "second" letter on April 23, 2020. But that's before the first letter on August 13,

attached the first letter to the complaint, but did not attach the second. *See* 8/13/20 Letter (Dckt. No. 15-1). But the substance of each letter was the same. *See* Am. Cplt., at ¶ 78 (Dckt. No. 15).

Nationstar didn't respond to the second letter. The Burkes sent a letter to Title365 as well, but it didn't respond either. *Id.* at ¶ 64.

The Burkes experienced anxiety and other side effects from the loss of tens of thousands of dollars. Thomas Burke experienced "sleeplessness, anxiety, irritability, and inability to effectively care for his family during the first days of the COVID quarantine." *Id.* at ¶ 72. Courtney Burke experienced "sleeplessness, anxiety, irritability, weight gain and upset stomach." *Id.* at ¶ 73.

In March 2021, the Burkes filed this lawsuit, and they later filed an amended complaint. *See* Cplt. (Dckt. No. 1); Am. Cplt. (Dckt. No. 15). The amended complaint includes six claims against Nationstar and Title365. The first claim arises under federal law, and the rest of the claims involve state law.

Count I is a claim under the Real Estate Settlement Procedures Act ("RESPA"). Count II is a claim for "negligence, gross negligence, and wanton conduct." Count III is a claim for aiding and abetting fraud. Count IV is a breach of fiduciary duty claim. Count V is a claim under the Illinois Consumer Fraud Act ("ICFA"). And Count VI is a claim for negligent misrepresentation.

The first claim is against Nationstar only (because only Nationstar is the servicer). The other five counts are against both Defendants. *See* Am. Cplt., at ¶¶ 75–81 (Dckt. No. 15).

Defendants moved to dismiss all counts. *See* Defs.' Mtn. to Dismiss (Dckt. No. 18).

---

2020. Maybe that date contained a typo – maybe they sent it on April 23, 2021. Or maybe they're telling the story out of order, by calling a letter dated April 23, 2020 the "second" letter even though they sent it before the "first" letter on August 13, 2020. In any event, the key point is that the Burkes sent a second letter, and Nationstar did not respond.

**Legal Standards**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Documents attached to a complaint "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (cleaned up).

**Analysis**

**I.    The Real Estate Settlement Procedures Act (Count I)**

The first claim involves the Real Estate Settlement Procedures Act (again, "RESPA"). *See* 12 U.S.C. § 2601 *et seq.* The claim is about the two letters that the Burkes sent to Nationstar, asking about the theft of their money.

"RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). The statute creates a cause of action by borrowers against loan servicers who fail to respond to certain requests for information. *See* 12 U.S.C. § 2605(f).

12

According to the Burkes, the letters were "qualified written requests" within the meaning of the statute, and thus triggered a duty by Nationstar to respond in a forthcoming manner. In their view, Nationstar breached that duty by failing to respond to the first letter adequately, and by failing to respond to the second letter at all. *See* Am. Cplt., at ¶ 79 (Dckt. No. 15).

Defendants moved to dismiss on two grounds. They argue that the letters did not fall within the meaning of a "qualified written request" under the statute. *See* 12 U.S.C. § 2605(e)(1)(B). And they argue that the Burkes did not plead any damages.

### A. Qualified Written Requests

The first issue is whether the letters from the Burkes fell within the boundaries of the statute. If they did, then Nationstar had a duty to respond and answer their questions. The punchline is that part of the letters fell within the boundaries of the statute, and part of the letters did not. The Act applied to the letters to the extent that they asked what happened to a payment on an existing loan.

RESPA is not an all-encompassing statute that requires servicers to provide any and all information to borrowers or potential borrowers upon request. "The statutory duty to respond does not arise with respect to all inquiries or complaints from borrowers to servicers. Rather, the statute covers only written requests alleging an account error or seeking information relating to loan servicing." *See Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 857 (7th Cir. 2017). It covers questions about the servicing of a preexisting loan.

Under RESPA, servicers have a duty to respond to so-called "qualified written requests," also known as "QWRs." *See* 12 U.S.C. § 2605(e). A QWR is a written request from the borrower to the servicer for "'information related to the servicing' of his loan or alleging that his account is in error." *See Perron*, 845 F.3d at 856–57 (citing 12 U.S.C. § 2605(e)(1)(A)–(B)).

The Act provides that a "qualified written request shall be a written correspondence . . . that – (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  *See* 12 U.S.C. § 2605(e)(1)(B).  Notice the use of the disjunctive in the last phrase.  The request must contain the reasons why the "account is in error," *or* details about "other information sought by the borrower."  *Id.*  So the borrower needs to be specific, and must equip the servicer with the basic information needed to answer the question.

When a borrower submits a QWR, a servicer must acknowledge receipt within five days. "If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days . . . ."  *See* 12 U.S.C. § 2605(e)(1)(A).

Within 30 days of receiving a QWR, the servicer must respond in one of three ways. Basically, a servicer needs to tell the borrower that:  (1) it fixed the problem; (2) there is no problem to fix; or (3) the servicer doesn't know if there is a problem.  Specifically:

> Not later than 30 days . . . after the receipt from any borrower of any qualified written request . . . the servicer shall:
>
> (A)  make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction . . .;
>
> (B)  after conducting an investigation, provide the borrower with a written explanation or clarification that includes . . . to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer . . . ; or

> (C) after conducting an investigation, provide the borrower with a written
> explanation or clarification that includes . . . information requested by the
> borrower or an explanation of why the information requested is
> unavailable or cannot be obtained by the servicer . . . .

*See* 12 U.S.C. § 2605(e)(2)(A)–(C).

"Servicing" means "receiving any periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . , and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required" by the "terms of the loan." *See* 12 U.S.C. § 2605(i)(3). A servicer under RESPA must respond to borrower requests "to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." *See* 12 U.S.C. § 2605(k)(1)(C).

The text presupposes the existence of a "loan," and an "account." *See* 12 U.S.C. § 2605(e)(1)(A); 12 U.S.C. § 2605(e)(2)(A). It covers questions about a *preexisting* loan and a *preexisting* account. Not a new loan.

The Burkes point to the two letters that they sent to Nationstar. They claim that the letters qualified as QWRs within the meaning of the Act. And they fault Nationstar for responding with a message that wasn't much better than talk-to-the-hand. *See* Am. Cplt., at ¶ 76 (Dckt. No. 15).

In the August letter, the Burkes posed a number of questions about their loss of funds. They requested a "full explanation of the events leading to the loss by the Burke's [sic] of funds that were to be used to pay off their prior Mr. Cooper loan." *See* 8/13/20 Letter, at 1 (Dckt. No. 15-1). They asked for supporting documents, too, meaning "copies of all letters, email, phone call notes and other communications among and between Mr. Cooper, Title 360 [sic], any other authorized or unauthorized persons and the Burke's [sic]." *Id.*

15

In the requests that followed, the letter drilled down on the topic of the fraud. They basically wanted to know what happened, and why it happened, and how it could have been prevented.

The Burkes requested an "explanation to the best of your ability of how a fraudulent party hacked into Mr. Cooper or Title 365." *Id.* They wanted a copy of "all communications between Mr. Cooper and Title 365 company regarding the Burke's [sic] refinancing application." *Id.* They requested a copy of all documents about the file, including "internal notations regarding the referenced loan and discovery that an unauthorized third party had been involved in the transaction." *Id.* The remaining dozen requests were variations on that theme.

The complaint sufficiently alleges that the Burkes sent a qualified written request within the meaning of RESPA to Nationstar. The letter dated August 13, 2020 falls within the parameters of the statute, at least in part. Here's the punchline: the letter falls within the statute when it asked about the *old* loan, but did not fall within the statute when it asked about a *new* loan.

Parts of the letter asked about the payment on the old loan. Recall that the Burkes wired $137,341.18 to pay down their mortgage loan, before closing on a new loan. That was a payment on an existing loan.

The August letter asked about the servicing of that loan, meaning the preexisting loan. It asked what happened to a payment on that loan. They requested a "full explanation of the events leading to the loss by the Burke's [sic] of *funds that were to be used to pay off their prior Mr. Cooper loan*." *See* 8/13/20 Letter, at 1 (Dckt. No. 15-1) (emphasis added).

By asking about a payment on an existing loan, the Burkes asked about the servicing of that loan. Again, "servicing" includes "any scheduled periodic payments from a borrower

16

pursuant to the terms of any loan," and "making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." *See* 12 U.S.C. § 2605(i)(3); *see also* 12 U.S.C. § 2605(k)(1)(C) ("A servicer of a federally related mortgage shall not . . . fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of *paying off* the loan . . . .") (emphasis added).

But not all of the August letter asked about the payment on the new loan. It asked about a host of other topics, too. Examples include questions about Nationstar's internal controls, Nationstar's policies about serving as an intermediary, Nationstar's hiring practices about cyber security, and so on. *See* 8/13/20 Letter, at 1–2 (Dckt. No. 15-1). Any topics that cover anything except the servicing of an old loan is not a QWR.

In particular, the August letter does not constitute a QWR to the extent that it asked about the creation of a *new* loan. RESPA does not cover questions about loan origination. *See Perron*, 845 F.3d at 857 ("[A] qualified written request can't be used to collect information about, or allege an error in, the underlying mortgage loan."); *Todd v. ShoreBank*, 2013 WL 3790966, at *4 (N.D. Ill. 2013) (dismissing a RESPA claim because "the substance of the letter relates to matters of loan origination, not loan servicing"); *Arriaga v. Wells Fargo Bank, N.A.*, 2013 WL 1303831, at *4 (N.D. Ill. 2013) ("Here, it is undisputed that all but one of the letters sought information regarding the origination of the loan and appraisal with DKMC, not the servicing of the loan with Wells Fargo. Therefore, those letters . . . do not qualify as QWR's under the act."); *see also Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 666–67 (9th Cir. 2012) ("'Servicing,' so defined, does not include the transactions and circumstances surrounding a loan's origination –

17

facts that would be relevant to a challenge to the validity of an underlying debt or the terms of a loan agreement.").

Questions about fraud for a new loan would not count, because that's not about servicing a preexisting loan. So, questions about refinancing would not fall within the statute to the extent that they covered the creation of the new loan, not the payment of the old loan. *See, e.g.*, *Au v. Republic State Mortg. Co.*, 948 F. Supp. 2d 1086, 1104 (D. Haw. 2013) (holding that the plaintiff's letter about possible fraud in his application to refinance did not "ask for servicing information" because it "challeng[ed] the loan's terms, ask[ed] for a loan modification, and ask[ed] for loan documents"); *see also Todd*, 2013 WL 3790966, at *6 ("Todd's letters do not raise any issues of account errors due to misapplied payments, un-cashed checks, or incorrect due dates or statement balances by the loan servicer. Instead his grievances have their origins in the application and origination process almost two years earlier.").

In sum, the letters to Nationstar can give rise to a claim, but only in part. The letters fell within the boundaries of RESPA to the extent that they covered a payment on an old loan. But the letters did not fall within the boundaries of RESPA to the extent that they covered the origination of a new loan, or anything else.

## B. Damages

Defendants also moved to dismiss on the grounds that the complaint fails to allege that the Burkes suffered any damages.

As a general matter, courts are not in the business of dismissing claims because the complaint does not contain details about damages. A complaint must state a *claim*, not all of the legal elements of a claim. *See Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) ("Because complaints need not identify the applicable law, it is manifestly inappropriate for a

18

district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each.") (cleaned up).

RESPA authorizes two types of damages. A borrower can recover actual damages, or statutory damages. Each type of damages is potentially on the table here. But the table has limited seating. Not everything is fair game.

More specifically, the Burkes cannot recover the stolen $35,531.43 from Nationstar under RESPA, even if Nationstar failed to respond to the QWRs in a manner that complied with the Act. The reason is simple. The theft took place more than four months before the Burkes sent the letter. A failure to respond appropriately in *August* 2020 could not cause a loss in *April* 2020.

When a loan servicer fails to comply with section 2605(e)(2), the borrower may seek "any actual damages to the borrower *as a result of* the failure." *See* 12 U.S.C. § 2605(f)(1)(A) (emphasis added). The Burkes must show that Nationstar "failed to comply with one of § 2605(e)(2)'s requirements and that [they] suffered actual injury as a result." *See Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 637 (N.D. Ill. 2019); *see also Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 590 (7th Cir. 2016) ("[T]he plain language of Section 2605 indicates that an allegation of actual damages is necessary to state a claim for liability.") (citation omitted).

The statute requires causation, meaning a connection between the violation and the loss by the borrower. *See Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1059 (7th Cir. 2018) ("[Section] 2605(f) requires Mr. Moore to provide evidence of actual damages to the borrower as a result of the failure of Wells Fargo to comply with RESPA. This causal connection is a critical element when bringing a RESPA claim.") (cleaned up); *Stephens v. Cap. One, N.A.*, 2016 WL 4697986, at *3 (N.D. Ill. 2016) ("[W]hen basing a claim on actual damages, the plaintiff has the

19

responsibility to set forth a causal link between the defendant's violation and the plaintiff's injuries.").

Here, the Burkes suffered a loss of about $35,000 by April 6, 2020. *See* Am. Cplt., at ¶¶ 36, 78 (Dckt. No. 15). The Burkes then sent their first letter to Nationstar on August 13, 2020. *Id.* at ¶ 58. So, there was a gap of more than four months between the Burkes' loss and their first letter to Nationstar.

The Burkes cannot recover the stolen funds through their claim under RESPA. The claim is about whether Nationstar responded appropriately to a letter received in August 2020. But the theft took place in April 2020. Nationstar's response in August 2020 did not cause a loss in April 2020. *See Byrd v. Homecomings Fin. Network*, 407 F. Supp. 2d 937, 946 (N.D. Ill. 2005) ("Byrd does not and cannot allege actual damage. The only actual damage Byrd alleges is the foreclosure of her mortgage. However, the damage had already been done by the state court's confirmation of the foreclosure sale on January 5, 2005, approximately three weeks before the sixty day time limit to respond to Byrd's qualified written request expired."); *see also Reda v. Nationstar Mortg., LLC*, 2020 WL 7353410, at *3 (N.D. Ill. 2020) ("[T]here is no set of facts where Reda suffered an actual loss from Defendant's QWR-related conduct well after the storm damage. . . . Even if Reda is right that Defendant's mishandling of the escrow account continued, the fact remains that only one set of damages is actionable: those caused by being uninsured during the storm.").

Maybe the Burkes could show some other type of actual financial loss from Nationstar's alleged failure to respond under RESPA. If so, then the Burkes might be able to recover emotional distress damages, too. *See Catalan*, 629 F.3d at 696 ("[E]motional distress damages are available as actual damages under RESPA, at least as a matter of law . . . .").

20

A plaintiff must first suffer a financial loss from a RESPA violation before pursuing emotional distress damages. *See Golbeck v. Johnson Blumberg & Assocs., LLC*, 2017 WL 3070868, at *10 (N.D. Ill. 2017) (collecting cases); *see also Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (holding that a plaintiff must first show that she suffered a financial loss before being "permitted to piggyback a claim for damages for incidental emotional distress"). So, if the Burkes muster evidence of a financial harm from a RESPA violation, then they can seek emotional distress damages, too. But that's a question for another day.

Alternatively, the Burkes can seek statutory damages of up to $2,000. The Burkes would need to show a "pattern or practice of noncompliance with the requirements of this section." *See* 12 U.S.C. § 2605(f)(1)(B).

Defendants argue that the Burkes have not alleged a "pattern or practice of noncompliance with the requirements of this section." But at the pleading stage, the bar for alleging damages is low. For now, it is enough to allege that the Burkes seek statutory damages. The proof can come later. And if the proof doesn't come later, summary judgment will.

The motion to dismiss the RESPA claim is granted in part and denied in part. The motion to dismiss is denied to the extent that the claim involves a request by the Burkes for information about their payment on an existing loan.

## II. Negligence (Count II)

Count II is a negligence claim. The Burkes allege that they lost almost $35,000 because of Defendants' "negligent, grossly negligent, and willful and wanton actions and omissions." *See* Am. Cplt., at ¶ 83 (Dckt. No. 15). The complaint alleges that each Defendant "owed Plaintiffs a duty not to sent [sic] wire instructions by unsecure email, and also to warn Plaintiffs not to send or accept sensitive information by unsecure email." *Id.* at ¶ 56.

The negligence theory is a little different for each Defendant. The Burkes claim that Nationstar acted negligently because it (1) "usurped the job of its affiliate Title 365 [sic] with regard to the transaction;" (2) failed to follow "well-known and long-established industry guidelines" to avoid fraud; (3) failed to maintain security protocols for customers' banking information; (4) failed to investigate why the bank cancelled the Burke's first wire; (5) failed to maintain close communication with the couple; (6) failed to follow "basic security procedures by inspecting each and every email to ensure the addresses were safe;" and (7) failed to offer the Burkes a safer means of sending confidential information than ordinary email. *Id.* at ¶ 83(a)–(k).

The Burkes claim that Title365 acted negligently because it failed to safeguard their confidential information. The complaint alleges that Title365 had a duty to "take all steps necessary to ensure that the closing would be handled in a safe, prudent, and reasonable manner." *Id.* at ¶ 52; *see also id.* at ¶ 84 (alleging that Title365 "willfully and wantonly breach[ed] those duties").

To state a claim for negligence, a plaintiff must allege "the defendant owed a duty of care, the defendant breached that duty, and the breach was a proximate cause of his or her injuries." *See Monson v. City of Danville*, 2018 IL 122486, 425 Ill. Dec. 526, 115 N.E.3d 81, 95 (2018); *see also Pendolino v. BAC Home Loans Servicing, LP*, 2011 WL 3022265, at *4 (N.D. Ill. 2011).

The complaint also refers to "gross negligen[ce]" and "wanton conduct." But the former is not a freestanding standing claim. *See Hamilton v. JPMorgan Chase & Co.*, 2020 WL 4586109, at *3 (N.D. Ill. 2020) ("Illinois does not recognize gross negligence as an independent ground for recovery.") (quoting *Merit Ins. Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979)) (Feinerman, J.). Accordingly, the Burkes' claim for "gross negligence" is an ordinary

negligence claim. *See id.* ("The court therefore construes the gross negligence claim as an ordinary negligence claim."); *DIC v. Crowe Horwath LLP*, 2018 WL 1508485, at *6 n.9 (N.D. Ill. 2018) ("The Court construes Count Two, labeled "Gross Negligence," as an ordinary negligence claim because gross negligence is not a recognized cause of action in Illinois.") (citation omitted); *Torrence v. U.S. Bankr. Ct., N.D. Illinois*, 2017 WL 3593116, at *6 (N.D. Ill. 2017) (same). The Burkes' reference to gross negligence is duplicative of their negligence claim.

In contrast, "[n]o separate and distinct tort exists for willful and wanton conduct. Rather, willful and wanton conduct is regarded as an aggravated form of negligence." *See Hamilton*, 2020 WL 4586109 at *3 (citing *Doe v. Coe*, 2019 IL 123521, 434 Ill. Dec. 117, 135 N.E.3d 1, 20 (2019)); *Artman v. Gualandri*, 2021 WL 2254961, at *3 (N.D. Ill. 2021) ("Allegations regarding willful and wanton misconduct are regarded as a form of aggravated negligence."). Aggravated negligence requires the "basic elements of a negligence claim," plus "a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *See Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 2012 IL 112479, 362 Ill. Dec. 484, 973 N.E.2d 880, 887 (2012).

So the Burkes' "wanton conduct" claim – which alleges "willful and wanton actions" by Defendants – is an aggravated negligence claim. *See* Am. Cplt., at ¶ 83 (Dckt. No. 15); *Hamilton*, 2020 WL 4586109, at *3 ("[T]he court construes the willful and wanton claim as an aggravated negligence claim."). Allowing the Burkes to proceed with an aggravated negligence claim is meaningful because they seek punitive damages, which can be awarded if Defendants acted in a grossly negligent or willful and wanton manner. *See Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1082 (7th Cir. 2019) ("Under Illinois law, punitive damages may be awarded only if the defendant's tortious conduct evinces a high degree of moral culpability, that

is, when the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.") (cleaned up).

In sum, Count II includes claims for negligence and aggravated negligence.

In their motion to dismiss, Defendants challenge only one element of a negligence (or aggravated negligence) claim. They argue that the Burkes have not alleged proximate causation. *See* Defs.' Mem. in Supp. of Defs.' Mtn. to Dismiss ("Defs.' Mem."), at 8–9 (Dckt. No. 19). Defendants argue that "even if sending wire instructions via unsecured email is a mistake or bad business practice, the encryption of the email would not have prevented the fraudster from stealing the funds in this case." *Id.* at 8. In their view, the fraudster would have stolen the money anyway.

Defendants turn the standard for a motion to dismiss inside out, and upside down. They basically argue that the fraud would have happened anyway, even if they had used encrypted email. But at the motion to dismiss stage, the Court must take the allegations of the complaint as true. And the inferences flow in favor of the plaintiff as the non-moving party.

At this early stage, the Burkes simply needed to plead enough facts to allow the Court to draw reasonable inferences in their favor. *See AnchorBank*, 649 F.3d at 614. They did so, and then some.

The complaint alleges multiple cybersecurity lapses on the email communications between the Burkes and Nationstar. The complaint alleges that Nationstar used unsecure email, and that practice exposed the Burkes to a risk of fraud. *See* Am. Cplt., at ¶¶ 4, 23, 56 (Dckt. No. 15).

24

The complaint also alleges that loan servicing agencies like Nationstar generally avoid unencrypted email when sending confidential closing information. *Id.* at ¶¶ 85(b), 85(d), and 85(h) of Count II. The complaint also states that Nationstar could have used an ordinary phone call to relay information, a safer method of communication than email. So the Burkes alleged the violation of industry standards, and the existence of an easy work-around.

Those well-pleaded facts are more than enough to state a claim. Maybe Nationstar's theory of the case will prove to be right down the road. But the Court must take the case one step at a time, and at this step in the process, the complaint controls.

The argument about Title365 is a closer call, but it's not a close call. The complaint does not include very many allegations about Title365. By all appearances, there were no communications between the Title365 and the Burkes. *Id.* at ¶ 47. Title365 was barely involved.

But maybe that's the point. The argument seems to be that Title365 should have participated, and taken steps to ensure that the process was safe and secure. The complaint alleges that Title365 "had duties to have had safeguards in place designed to prevent the fraud that happened here, but either had no such safeguards or failed to follow their own policies or protocols concerning such." *Id.* at ¶ 29. Title365 does not offer this Court any reason to conclude that that claim fails from day one.

Defendants' motion to dismiss the negligence claim is denied.[2]

---

[2] The parties do not mention the economic loss doctrine. The Illinois Supreme Court adopted the economic loss rule in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 61 Ill. Dec. 746, 435 N.E.2d 443 (1982). The rule "holds that a plaintiff may not recover for solely economic loss in tort." *See Fattah v. Bim*, 2016 IL 119365, 402 Ill. Dec. 411, 52 N.E.3d 332, 337 (2016). "In essence, the economic loss, or commercial loss, doctrine denies a remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations." *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615 (7th Cir. 2001) (citation omitted).

### III.     Aiding and Abetting Fraud (Count III)

Next, the Burkes bring a claim of aiding and abetting fraud against both Defendants.  *See* Am. Cplt., at ¶¶ 84–91 (Dckt. No. 15).

To plead aiding and abetting fraud, a plaintiff must plead the common law tort of fraud, and then plead the elements of aiding and abetting.  *See Fifth Third Mortg. Co. v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019) ("Anyone who aids and abets a fraud is 'also guilty of the tort of fraud.'") (citing *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006)); *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 624 (7th Cir. 2000) ("Law should be kept as simple as possible.  One who aids and abets a fraud is guilty of the tort of fraud (sometimes called deceit); nothing is added by saying that he is guilty of the tort of aiding and abetting as well or instead."); *see also Brinley Holdings, Inc. v. Husch Blackwell LLP*, 2022 WL 80271, at *6 (N.D. Ill. 2022) ("[T]he inchoate aiding and abetting liability is incorporated into the substantive tort."); *Amran Prop. Invs., LLC v. Fid. Nat'l Title Grp., Inc.*, 2021 WL 3883087, at *3 (N.D. Ill. 2021) (listing the elements of fraud alongside aiding and abetting).

To state a claim of common law fraud, a plaintiff must allege:  "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."  *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (citing *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 221 Ill. Dec. 389, 675 N.E.2d 584, 591 (1996)); *see also Miner v. Gov't Payment Serv., Inc.*, 2015 WL 3528243, at *3 (N.D. Ill. 2015).

To state a claim for aiding and abetting, a plaintiff must allege:  "(1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his

role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Fifth Third Mortg. Co.*, 934 F.3d at 588 (citation omitted).

Burke alleges that the Defendants aided and abetted the third-party fraudster in committing fraud, so a heightened pleading standard applies. "Under Federal Rule of Civil Procedure 9(b), the [plaintiff has] to state with particularity the circumstances constituting fraud. This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted); *see also Kroll v. Cozen O'Connor*, 2020 WL 919005, at *6 (N.D. Ill. 2020) ("In asserting claims of fraud – including claims for aiding and abetting fraud or a breach of fiduciary duty that involves fraud – a complaint is required to plead the circumstances that allegedly constitute fraud with particularity.") (citation omitted). The complaint must paint "a sufficiently detailed picture of the alleged scheme." *See AnchorBank*, 649 F.3d at 615.

That standard does not apply to knowledge. Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See* Fed. R. Civ. P. 9(b).

The Burkes weren't required to plead Defendants' *knowledge* of the fraudulent scheme under a heightened pleading standard. Even so, they failed to allege knowledge generally. The complaint never states that Defendants had knowledge of the underlying fraudulent scheme in any manner.

If anything, the complaint alleges the opposite. Nationstar and Thomas Burke learned about the fraudster *at the same time*. *See* Am. Cplt., at ¶ 39 (Dckt. No. 15) ("[B]oth Mr. Burke and Mr. Sanford realized that the email addresses they'd been using were fraudulent. They

discovered that the transaction had been highjacked; whereupon Mr. Sanford sated [sic] "'Oh sh*t!.'").

The complaint does not allege that Nationstar had knowledge of the fraud. Instead, it alleges that Nationstar learned about the fraud after the Burkes called about the stolen money. The complaint does not allege that Nationstar "was aware of [its] role" in the fraud, or that it "knowingly and substantially assisted the violation." *See Hefferman*, 467 F.3d at 601.

Maybe Nationstar's negligence opened the door to the fraudster, but that's a far cry from alleging that Nationstar aided and abetted the fraud. Aiding and abetting applies to someone who was "in on it" – that is, who knew that there was a fraud, and helped things along.

But that's not the situation here. Nationstar didn't know that a fraudster had compromised its communications with the Burkes. Without knowing about the fraud, Nationstar couldn't knowingly and substantially assist the fraud. The same is true of Title365, too.

The lack of knowledge means that there is no aiding and abetting claim. *See, e.g.*, *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("Anyone who would be guilty in a criminal proceeding of aiding and abetting a fraud would be liable under tort law as a participant in the fraud, since aider-abettor liability requires participation in the criminal venture."); *Peterson v. A Clear Title & Escrow Exch., LLC*, 2017 WL 1134483, at *4 (N.D. Ill. 2017) ("Plaintiffs' aiding and abetting claim fails because the complaint does not adequately plead how Michalowska assisted in the fraud.").

The Court dismisses the claim for aiding and abetting fraud.

## IV.    Breach of Fiduciary Duty (Count IV)

Next, the Burkes assert a breach of fiduciary duty claim against both Defendants. *See* Am. Cplt., at ¶¶ 92–101 (Dckt. No. 15).

28

The couple claims that Nationstar had a fiduciary duty because it "directed Plaintiffs to partially pay off the existing mortgage by using a wire transfer to an escrow agent, TITLE365," and thereby directed the handling of funds and assumed the role of fiduciary in the process. *Id.* at ¶ 97. For its part, Title365 assumed fiduciary duties because of its intended role as an escrow agent. *Id.* at ¶ 95.

According to the complaint, Nationstar breached a fiduciary duty by permitting the use of email for wire instructions, and Title365 breached its fiduciary duty by delegating its role to Nationstar and remaining "completely absent" from the transaction. *Id.* at ¶¶ 95–100.

"In order to state a claim for breach of fiduciary duty, a complaint must allege that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015) (cleaned up). A fiduciary duty arises either as "a matter of law or by special circumstances." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006)

Defendants argue that a mortgagor-mortgagee relationship cannot give rise to a fiduciary relationship as a matter of law. *See* Defs.' Mem., at 10–11 (Dckt. No. 19). They maintain that "although there was no contract because the prospective loan was never funded, to the extent there was any relationship at all, it was at arm's length." *Id.* at 11.

As a general matter, a mortgagee is not a fiduciary of a mortgagor. *See Avila*, 801 F.3d at 782 ("Some fiduciary relationships exist as a matter of law (e.g., the attorney-client relationship), but the mortgagor-mortgagee relationship is not one of them."); *Mitchell v. Norman James Const. Co.*, 291 Ill. App. 3d 927, 684 N.E.2d 872, 879 (1997) ("As a matter of law, a

29

conventional mortgagor-mortgagee relationship standing alone does not give rise to a fiduciary or confidential relationship.").

That said, a fiduciary relationship can arise between a lender and borrower in certain limited circumstances. *See Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) ("It is possible that the particular circumstances surrounding a relationship will make it a fiduciary relationship, even if the general class of debtor-creditor relationships is not."). Illinois courts do not categorically ban a fiduciary relationship between a mortgagor and mortgagee because special circumstances may exist. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 573 n.10 (7th Cir. 2012) ("Illinois recognizes that a mortgagee owes a fiduciary duty to a mortgagor in some narrow aspects of the relationship . . . .").

"A fiduciary duty may arise 'on an ad hoc basis' where an individual or entity solicits another to trust him in matters in which he represents himself to be expert as well as trustworthy and the other is not expert and accepts the offer and reposes complete trust in him . . . ." *Jones v. Countrywide Home Loans, Inc.*, 2010 WL 551418, at *5 (N.D. Ill. 2010) (citing *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992)); *Olszewski v. Quicken Loans Inc.*, 2013 WL 317060, at *3 (N.D. Ill. 2013) (observing that "the conventional mortgagor-mortgagee relationship, standing alone, is insufficient to sustain an allegation of a fiduciary relationship," while granting that "a fiduciary relationship may occur where one party, due to a close relationship, relies heavily on the judgment of another") (citation omitted); *Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 875 (N.D. Ill. 2002).

Nationstar made only one argument in the motion to dismiss. It argued that there is a *per se* rule that a mortgagor/mortgagee relationship never gives rise to a fiduciary duty. That principle sweeps too broadly. It depends on the facts.

30

Nationstar could have advanced the additional argument that the allegations of the complaint do not suggest any other basis for a fiduciary duty. That is, Nationstar could have argued that the case does not involve any other special circumstances that could have given rise to a fiduciary duty.

But Nationstar never made that argument. Instead, it argued that – as a categorical matter – the relationship between a mortgagor and a mortgagee can never involve a fiduciary duty. The door to a fiduciary relationship may not be open very far, but it is not closed and locked, either.

Down the road, at the summary judgment stage, Nationstar will have an opportunity to argue that the facts of the case do not give rise to a fiduciary relationship. But at this point, this Court has nothing except the complaint, and an argument that sweeps too broadly. So, for that reason, the motion to dismiss the fiduciary duty claim is denied.

Separately, the Burkes argue that Nationstar owed a fiduciary duty because it was supposed to receive funds in escrow. The Burkes argue that Nationstar functioned as a "fiduciary-in-fact" because it "usurped the role typically held by Title365" during the transaction with the Burkes. *See* Am. Cplt., at ¶ 43 (Dckt. No. 15). According to the Burkes, Title365 was the designated escrow agent for the closing, but Nationstar acted as the escrow agent during the closing and therefore assumed a fiduciary duty. *See id.* at ¶ 97; Pls.' Opp. to Mtn. to Dismiss, at 12–13 (Dckt. No. 23) ("[A]lthough Plaintiffs acknowledge that mortgage companies are not typically thought of as fiduciaries, the Amended Complaint alleges that Nationstar voluntarily accepted a fiduciary duty by usurping the role of the escrow agent when it provided funding instructions to the Burkes it knew were likely to permit fraud and theft of Plaintiffs' money.").

Courts "have held that mismanagement of an escrow may give rise to a cause of action for a breach of fiduciary duty." *See Choi v. Chase Manhattan Mortg. Co.*, 63 F.Supp.2d 874,

885 (N.D. Ill. 1999) (collecting cases); *Avila*, 801 F.3d at 783 ("If under the mortgage agreement CitiMortgage was an escrow agent, then Avila has adequately alleged the existence of a fiduciary duty."). An escrow agent owes a fiduciary duty because it is holding someone else's money.

The parties do not address whether that fiduciary duty exists when the escrow agent doesn't receive the funds at all. And here, Nationstar never received the money from the Burkes. The parties do not discuss whether Nationstar owed a fiduciary duty to protect funds that it never received. The parties can address that issue down the road if necessary.

The motion to dismiss the fiduciary duty claim is denied.

## V.     The Illinois Consumer Fraud Act (Count V)

The Burkes also bring a claim under the Illinois Consumer Fraud Act (again, "ICFA") against both Defendants. The allegations are similar to the allegations about aiding and abetting fraud. *See* Am. Cplt., at ¶¶ 102–16 (Dckt. No. 15).

A claim under the ICFA requires a plaintiff to prove "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *See Skyrise Constr. Grp., LLC v. Annex Constr., LLC*, 956 F.3d 950, 960 (7th Cir. 2020) (citing *De Bouse v. Bayer*, 235 Ill. 2d 544, 337 Ill. Dec. 186, 922 N.E.2d 309, 313 (2009)).

Once again, the Burkes have a heighted pleading standard because they allege fraud. The ICFA addresses a deceptive act or practice, so the Burkes must describe the "who, what, when, where, and how" of the fraud. *See AnchorBank*, 649 F.3d at 615 (citation omitted); *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) ("If the claim rests on allegations of deceptive conduct, then Federal Rule of Civil Procedure 9(b) applies and the

32

plaintiff must plead with particularity the circumstances constituting fraud.") (cleaned up). But the heighted pleading standard does not apply to Defendants' intent. *See* Fed. R. Civ. P. 9(b).

Under the ICFA, an act is deceptive "if it creates a likelihood of deception or has the capacity to deceive." *See Benson*, 944 F.3d at 646. Courts look to whether the statement would mislead "a reasonable consumer." *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 673 (7th Cir. 2015).

The Burkes have failed to plead a deceptive act by either Nationstar or Title365. The complaint alleges that a loan officer with Nationstar told the Burkes that the couple will "want to use the email to sign" the closing documents. *See* Am. Cplt., at ¶ 19 (Dckt. No. 15). And the Burkes argue that Defendants "acted as if it was 'normal' to communicate wire transfer instructions by email." *Id.* at ¶ 107.

That allegation, without more, is not deception. The complaint alleges that the loan officer departed from the standard of care. The complaint does not allege that the loan officer tricked the Burkes, or duped them somehow, or otherwise pulled the wool over their eyes. For example, there is no allegation that the loan officer directed the Burkes to sign the documents electronically, knowing that the link would redirect them to a fraudster who would steal their money.

Plaintiffs fail to point to a deceptive act. First, the Burkes successfully signed the documents that Nationstar referred to in its email. Nationstar sent the email to Thomas Burke on March 20, 2020. *Id.* at ¶ 19. Thomas Burke signed the document and emailed back a copy to Nationstar that same day. *Id.* at ¶ 20. So the Burkes can't maintain that any particular email by Nationstar constituted a deceptive act.

33

Second, the Burkes' allegation that Nationstar acted as if it was "normal" to use email to send closing documents is too ambiguous to state a deceptive act. The complaint does not even describe an affirmative act by Nationstar in relation to using email. For instance, the Burkes do not allege that Nationstar told them to exclusively email, that emailing was the safest form of communication and standard practice for sending closing documents, or gave them any similar assurances. The Burkes must plead the who, what, when, where, and how of the fraud. They only managed to allege the "who."

Similarly, the Burkes allege no deceptive act by Title365. In fact, they allege no *acts* by Title365 at all. The complaint itself says so. *See id.* at ¶ 47 ("Title365 *never* communicated directly with the Burkes.") (emphasis in original).

Accordingly, the Court dismisses the Burkes' ICFA claim against Nationstar and Title365.

## VI. Negligent Misrepresentation (Count VI)

Finally, the Burkes bring a negligent misrepresentation claim against both Defendants. *See* Am. Cplt., at ¶¶ 117–26 (Dckt. No. 15).

The Burkes allege that Nationstar's failure to inform the Burkes about the risks associated with email constitutes an omission of material fact, which qualifies as a misrepresentation. *See* Pls.' Opp. to Mtn. to Dismiss, at 14–15 (Dckt. No. 23).

Under Illinois law, to state a claim for negligent misrepresentation, a plaintiff must allege "(1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate

information." *See Rideaux v. Travelers Ins. Co.*, 2013 WL 3354462, at *4 (N.D. Ill.

2013) (citing *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 300 Ill. Dec.

69, 843 N.E.2d 327, 332 (2006)).

Defendants make only one argument against the negligent misrepresentation claim.

Defendants argue that Nationstar or Title365 never made a false statement or omission of

material fact. *See* Defs.' Mem., at 12–13 (Dckt. No. 19); Defs.' Reply, at 7 (Dckt. No. 25). As

they see it, the only misrepresentation in the case came from the fraudster.

Defendants miss the target. The Burkes allege that Nationstar failed to give them

accurate information about how to transfer funds safely. *See* Am. Cplt., at ¶¶ 65, 69, 72, 73, 121,

125 (Dckt. No. 22). In their view, that failure to disclose was an actionable omission.

The claim is not about a false statement. That is, the Burkes do not claim that Nationstar

said something to them that was false. Instead, the claim is about an omission. It is about what

Nationstar did not say.

There is an elephant in the room, but the parties don't spot it. The theory raises the

question whether an omission can give rise to a claim of negligent misrepresentation under

Illinois law. But the parties do not address that issue at all. In the motion to dismiss, Defendants

omitted any argument that an omission is not actionable. So, for now, the claim survives.

By way of analogy, under the federal securities laws, there is no freewheeling duty to

disclose when selling securities. *See e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44

(2011) ("[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to

disclose any and all material information."); *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th

Cir. 1990) ("The securities laws do not impose general duties to speak . . . ."). A failure to

disclose can give rise to a claim when it is necessary to make a statement *not* misleading. *See,*

*e.g.*, *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) ("The express language of 10b–5 only proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements."); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *15 (S.D.N.Y. 2020) ("A pure omission is only actionable under the securities laws [ ] when the corporation is subject to a duty to disclose the omitted facts.  Nonetheless, pure omissions, which are generally not actionable, differ from 'half truths,' or statements that are misleading under the second prong of Rule 10b-5 by virtue of what they omit to disclose.  The law is well settled [ ] that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud.") (cleaned up).

The federal securities laws cover half-truths (and half-falsities).  It is the difference between failing to tell your clerks that there is a tiger in the office, and telling your clerks that there is a cat in the office (which, it turns out, happens to be a tiger).

The parties seem to take it as a given that an omission can give rise to a negligent misrepresentation claim.  Some courts have said so, but the case law is relatively thin, citing little.  *See Kmak v. Sorin Grp. Deutschland GmbH*, 2017 WL 8199974, at *7 (N.D. Ill. 2017); *LM Ins. Corp. v. Sourceone Grp. Inc.*, 2006 WL 2051368, at *11 n.17 (N.D. Ill. 2006) ("A negligent omission claim is a type of negligent misrepresentation claim.").  Based on this Court's initial search, Illinois courts do not appear to have addressed the issue.  But "[n]egligent misrepresentation by nondisclosure is a claim of questionable heritage and has been soundly rejected in some jurisdictions."  *Eberts v. Goderstad*, 569 F.3d 757, 765 (7th Cir. 2009) (collecting cases).  Since the parties assume that an omission can give rise to a negligent misrepresentation claim, this Court will too (for now).

The motion to dismiss the negligent misrepresentation claim is denied.

## Conclusion

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part.

The Court grants in part and denies in part the motion to dismiss Count I (RESPA) against Nationstar. The motion is denied to the extent that the claim involves a request by the Burkes for information about their payment on an existing loan.

The Court denies the motion to dismiss Count II (negligence and aggravated negligence).

The Court grants the motion to dismiss Count III (aiding and abetting fraud).

The Court denies the motion to dismiss Count IV (breach of fiduciary duty).

The Court grants the motion to dismiss Count V (ICFA).

The Court denies the motion to dismiss Count VI (negligent misrepresentation).

Date: March 25, 2022

Steven C. Seeger
United States District Judge